IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| LARRY SHIFFLETT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:06CV00127 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| GENERAL ELECTRIC COMPANY, | ) | By: Hon. Glen E. Conrad |
| et al., | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

Larry Shifflett filed this diversity action against General Electric Company ("GE"),
Electric Power Systems, Inc., and Electric Power Systems International, Inc. (collectively
"EPS"), seeking recovery for injuries that Shifflett sustained on January 19, 2005, while working
on a switchboard manufactured by GE.  Shifflett alleges that GE negligently designed, tested, and
manufactured the switchboard, and that EPS negligently performed a short circuit study of the
switchboard's overcurrent protective devices.  The case is presently before the court on EPS's
motion for summary judgment.  For the following reasons, the court will deny the motion.

**Factual and Procedural Background**

Shifflett was previously employed as a professional electrician by Design Electric, Inc.
("Design Electric").  During January of 2005, Design Electric served as the electrical
subcontractor for the Middle River Regional Jail project in Verona, Virginia.  Design Electric
purchased a Spectra Series Switchboard from GE for installation at the jail, and hired EPS to
perform a short circuit coordination study.

The switchboard, which was located in a locked electrical equipment room at the jail, is
comprised of six vertical sections, numbered one through six.  Electricity is routed into section

one of the switchboard from the power company, and is then transmitted through bus bars that run vertically in each of the other five sections.  The switchboard contains a push-button switch on the outside of section four, which allows individuals to de-energize and lock out downstream sections of the switchboard.

The switchboard contains several warning labels.  One of the labels cautions against electrical arc flashes and requires the use of personal protection equipment:

**WARNING**

**ELECTRICAL ARC FLASH HAZARD**

**PERSONAL PROTECTION
EQUIPMENT REQUIRED**

**FAILURE TO COMPLY CAN RESULT
IN INJURY OR DEATH**

**REFER TO NFPA 70E**

**Article 110.16 Flash Protection, 2002 NEC**

Another label warns against removing barriers or entering the enclosure before de-energizing power to the switchboard:

**DANGER**

**HAZARDOUS VOLTAGE
WILL CAUSE SERIOUS
INJURY OR DEATH**

**DE-ENERGIZE ALL
POWER BEFORE
ENTERING ENCLOSURE
OR REMOVING BARRIERS**

**ALL SERVICE
DISCONNECTS MUST**

2

**BE OPEN TO
DE-ENERGIZE ALL
LOAD BUS BARS AND
CIRCUITS**

**REPLACE COVERS/
BARRIERS, BEFORE
ENERGIZING**

On the morning of January 19, 2005, Shifflett was in the electrical equipment room performing some general housekeeping chores with his nephew, Matthew Shifflett, who served as his assistant. At that time, the switchboard was energized. The panel cover for section five of the switchboard had been left off at the end of the previous day, and Shifflett intended to replace the panel cover.

When Shifflett knelt in front of the open section of the switchboard, he noticed a loose cable in the floor of the cabinet. Shifflett identified the cable as a ground cable, since it was marked with green tape. The cable was in the portion of the section five cabinet where ground cables and neutral cables were connected to the ground bar and neutral bar. Shifflett tested the ground bar and the neutral bar with a "wiggie" or voltmeter, and verified that there was no current in either bar. Shifflett also believed, albeit incorrectly, that there was an insulated divider or barrier that separated the lower portion of section five from the upper portion's energized bus bars. Consequently, Shifflett determined that it was safe to reach into the lower portion of section five to retrieve the loose cable, so that he could determine the appropriate size lug to use to connect the cable to the ground bar.

As Shifflett turned to ask Matthew for a light so that he could better see the size of the cable, Shifflett apparently relaxed his grasp on the cable. Due to the cold temperature of the room, the cable was stiff and recoiled back into the cabinet. The cable subsequently came into

3

contact with an energized bus bar in the upper portion of section five, which triggered an arc flash. The arc flash ignited Shifflett's clothing, resuling in severe burns to his arms, upper torso, face, and hands. At the time of the incident, Shifflett was not wearing any personal protective equipment aside from a hard hat.

Shifflett filed this action on December 27, 2006. Shifflett claims that GE was negligent in its design, testing, and manufacture of the switchboard, and that GE's negligence was a direct and proximate cause of the accident and his resulting damages. Shifflett claims that EPS was negligent in its performance of the short circuit coordination study, and that his injuries were rendered more severe as a result of EPS's negligence. He seeks damages in the amount of $10,000,000.00.

Subsequent to the filing of Shifflett's complaint, GE and EPS moved for summary judgment. To support their motions, both defendants argue that Shifflett's claims are barred by the defenses of contributory negligence and assumption of the risk. The court held a hearing on the defendants' motions on October 4, 2007. Following the hearing, Shifflett settled his claim against GE, leaving only his claim against EPS.

## **Standard of Review**

An award of summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining

whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party.  <u>Terry's Floor Fashions, Inc. v. Burlington Indust., Inc.,</u> 763 F.2d 604, 610 (4th Cir. 1985).

## Discussion

I.   <u>Shifflett's claim against EPS</u>

As previously stated, Shifflett alleges that EPS acted negligently in its performance of the short circuit coordination study.  Specifically, Shifflett alleges that EPS owed a duty to the plaintiff, and others similarly situated, to use reasonable care in performing the short circuit study, and that EPS breached its duty by failing to use accepted engineering practices; failing to comply with industry-recognized standards; failing to confirm the primary fuse size and impedance of the transformer serving the jail; failing to obtain the actual, available fault current data; and failing to conduct proper tests and inspections of the switchboard's overcurrent protective devices.  Shifflett alleges that EPS's flawed short circuit study created a situation in which the protective devices in the switchboard were not properly applied, and that the protective devices were set in such a manner that they did not operate as rapidly as possible, causing the arc flash to be of longer duration.  Shifflett further alleges that his injuries were rendered more severe by the extended duration of the arc flash.

II.   <u>Viability of contributory negligence as a defense to this claim</u>

EPS has moved for summary judgment, arguing that Shifflett's claim is barred by the defenses of contributory negligence and assumption of the risk.  In response to EPS's motion, Shifflett argues that he has asserted an "enhanced injury" claim against EPS, and that any negligence on the part of Shifflett is irrelevant and should be excluded.  Shifflett notes that

"[e]nhanced injury cases often arise out of automobile collisions and are referred to as 'crashworthiness' or 'second collision' cases," but that "enhanced injury cases are not limited to auto collisions." (Pl.'s Initial Br. at 6.) Shifflett then cites several federal and state circuit court decisions to support the proposition that the Virginia Supreme Court would recognize the "enhanced injury" or "crashworthiness" doctrine. See Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066, 1069-70 (4th Cir. 1974) (assuming, without deciding, that Virginia would recognize the "crashworthiness" doctrine); Euler v. American Isuzu Motors, Inc., 807 F. Supp. 1232, 1236 (W.D. Va. 1992) ("predict[ing] that the Virginia Supreme Court would adopt the 'crashworthiness' doctrine"); Adimasu v. Nissan Motor Co., 37 Va. Cir. 532, 533 (Va. Cir. 1995) (overruling the defendant's demurrer to the extent that it was based on the argument that Virginia would not recognize a cause of action for "crashworthiness"). Shifflett also cites Binakonsky v. Ford Motor Co., 133 F.3d 281, 287-88 (4th Cir. 1998) (applying Maryland law) to support the proposition that the defense of contributory negligence is inapplicable to an "enhanced injury" or "crashworthiness" claim.

Although EPS filed a reply brief disputing Shifflett's arguments regarding the application of the "enhanced injury" or "crashworthiness" doctrine, both EPS and Shifflett overlooked the Virginia Supreme Court's decision in Slone v. General Motors Corp., 457 S.E.2d 51 (Va. 1995).[1] In Slone, the Supreme Court considered, in part, whether the plaintiff, who was injured when the dump truck he was driving rolled over, had a viable cause of action against the manufacturer of the truck sufficient to withstand a motion for summary judgment. Slone, 457 S.E.2d at 51. The

---

[1] By letter dated October 10, 2007, the court requested comments from Shifflett and EPS regarding the significance of this case. The parties subsequently filed supplemental briefs.

accident occurred while the plaintiff was attempting to dump a load of gravel at a depot. Id. at

52. The gravel beneath the truck began to crumble, and as the ground gave way, the truck flipped

backward and slid down the side of the dump site, crushing the plaintiff. Id.  The plaintiff filed

suit against several defendants, including General Motors Corporation, the manufacturer of the

truck. Id. Specifically, the plaintiff alleged that General Motors "was negligent and breached

certain implied warranties because General Motors designed the truck body 'with inadequate

bracing and support thereby significantly increasing the risk that, in a foreseeable rollover of the

truck body, the roof would easily cave in and cause passengers to suffer serious, painful and

grievous bodily injuries.'" Id. The plaintiff also alleged that General Motors' design of the

truck's cab failed to include crash padding that, in a foreseeable rollover, would have prevented

and/or mitigated the type of injuries suffered by the plaintiff. Id. General Motors moved for

summary judgment, asserting that it was entitled to judgment as a matter of law, because Virginia

did not recognize the doctrine of "crashworthiness." Id. at 53. The trial court granted General

Motors' motion at the pleading stage of the proceedings, holding that even if Virginia recognized

the "crashworthiness" doctrine, General Motors was not liable to the plaintiff. Id.

On appeal, the Supreme Court specifically rejected the "crashworthiness" doctrine,

finding "no reason to confuse [its] well-settled jurisprudence."[2] Id. Instead, the Court relied on

---

[2]  The Court explained the "crashworthiness" doctrine as follows:

> "A crashworthy vehicle is defined as 'one which, in the event of a
> collision, resulting accidentally or negligently from the act of another
> and not from any defect or malfunction in the vehicle itself, protects
> against unreasonable risk of injury to the occupants.' The concept, in the
> main, concerns the dangers posed by the vehicle occupants' collision
> with the interior of the vehicle upon collision, or the intrusion of moving

7

its established principles "that govern whether a manufacturer of a product owes a duty to a person injured by that product." Id. In explaining these principles, the Court first noted that "a manufacturer is not required to supply an accident-proof product." Id. at 54. The Court then summarized the principles previously set forth in Logan v. Montgomery Ward & Co., 219 S.E.2d 685 (Va. 1975) and Featherall v. Firestone Tire and Rubber Co., 252 S.E.2d 358 (Va. 1979):

> In Logan v. Montgomery Ward, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975), we stated several principles which are pertinent here:
>
>> The standard of safety of goods imposed on the seller or manufacturer of a product is essentially the same whether the theory of liability is labeled warranty or negligence.  The product must be fit for the ordinary purposes for which it is to be used . . . . Under either the warranty theory or the negligence theory the plaintiff must show, (1) that the goods were unreasonably dangerous either for the use to which they would ordinarily be put or for some
>
> ────────────────
>
> or standing objects, upon collision, into the passenger area.
>
> . . . .
>
> The crashworthiness doctrine does not, however, impose a duty on the manufacturer to design a car which is safe for all collisions. Rather, the theory of liability obligates the manufacturer to design a vehicle that protects the passenger from unreasonable risk of harm. The factors to be considered in determining whether the risk is unreasonable include the likelihood of the harm, the obviousness of the danger, the purpose for which the vehicle is to be used, the styling, the cost of reducing the risk, and the circumstances of the accident." Madden, Products Liability § 8.4 (2d ed. 1988).

Slone, 457 S.E.2d at 54.

8

> other foreseeable purpose, and (2) that the
> unreasonably dangerous condition existed when the
> goods left the defendant's hands.
>
> In Featherall v. Firestone, we restated the principles that we
> applied in Logan, and we implicitly recognized that a manufacturer
> may be held liable for the foreseeable misuse of its product. We
> stated, "and there can be no recovery against the manufacturer for
> breach of these implied warranties when there has been an
> unforeseen misuse of the article supplied." Featherall, 219 Va. at
> 964, 252 S.E.2d at 367.

Id.

Applying the aforementioned principles, the Supreme Court concluded that the trial court

erred by granting General Motors' motion for summary judgment. Id. The Court emphasized

that the plaintiff pled, with respect to both his negligence and breach of warranty claims, "that the

truck cab was unreasonably dangerous, that the unreasonably dangerous condition existed when

it left General Motors' possession, and that the possibility of a 'rollover,' a misuse, was

reasonably foreseeable on the part of General Motors." Id. Additionally, the Court was unable to

find, on the basis of the record before it, that there was a misuse that was unforeseeable as a

matter of law. Id.

Based on the Supreme Court's decision in Slone, Shifflett's arguments regarding the

viability of the "enhanced injury" or "crashworthiness" doctrine in Virginia are without merit.

Moreover, it is clear that Shifflett's claim against EPS should be evaluated in light of traditional

negligence principles, and thus, that contributory negligence and unforeseeable misuse are viable

defenses. See, e.g., Va. Civil Jury Instr. No. 34.190 ("If the plaintiff uses a product in a manner

which he knows, or by using ordinary care should know, is unsafe, then he is negligent."); Va.

Civil Jury Instr. No 34.200 ("The plaintiff cannot recover if he misused the product or used it in a

way not reasonably foreseeable by the manufacturer."). The court recognizes that Shifflett has, at times, solely characterized his claim against EPS as an "enhanced injury" claim. However, the court believes that the allegations in his complaint are sufficient to state a claim for simple negligence.[3] Consequently, the court declines to dismiss the claim, and will instead consider whether EPS is entitled to summary judgment on the basis of contributory negligence or assumption of the risk.

III.   Application of the defenses of contributory negligence and assumption of the risk

EPS contends that Shifflett acted with contributory negligence by failing to de-energize the switchboard before reaching into it; failing to wear personal protective equipment; and failing to ascertain whether he was in proximity to a live circuit. Similarly, EPS contends that Shifflett assumed the risk of injury by working on energized equipment without taking proper safety precautions.

Under Virginia law, both contributory negligence and assumption of the risk operate as a complete bar to recovery for a defendant's alleged negligence. See Perdue v. Patrick, 29 S.E.2d 371, 375 (Va. 1944); Thurmond v. Prince William Prof'l Baseball Club, 574 S.E.2d 246, 249 (Va. 2003). A plaintiff's negligence claim is barred by his contributory negligence if he "failed to act as a reasonable person would have acted for his own safety under the circumstances." Artrip v. E.E. Berry Equip. Co., 397 S.E.2d 821, 824 (Va. 1990). Whereas contributory negligence involves an objective standard, assumption of the risk focuses on the plaintiff's

---

[3] The court notes that in EPS's reply to Shifflett's response to the company's motion for summary judgment, EPS, itself, emphasizes that "this case, by whatever name the Plaintiff wants to call it, is . . . simply a routine case of negligence." (EPS's Reply Br. at 3.) EPS further emphasizes that "despite Plaintiff's attempt to paint his claim[] as an 'enhanced injury' claim, the gravaman of his claim is simply negligence." (EPS's Reply Br. at 4.)

subjective state of mind, asking whether the plaintiff "fully understood the nature and extent of a known danger and voluntarily exposed himself to it." Id. Unless reasonable minds could not differ on these issues, they are for the jury to decide. Id. at 823.

To support its motion for summary judgment on the issue of contributory negligence, EPS advances several arguments. First, EPS argues that Shifflett acted contrary to the warnings on the switchboard and the governing OSHA regulation, 29 C.F.R. § 1926.416,[4] by failing to wear personal protective equipment and then reaching into an energized switchboard. Likewise, EPS argues that Shifflett violated the governing OSHA regulation by failing to ascertain whether he was in proximity to a live circuit.[5] EPS emphasizes that Shifflett incorrectly assumed that there was an insulated barrier or divider between the upper and lower portions of section five, and that Shifflett did not attempt to determine whether such barrier or divider actually existed. Additionally, EPS argues that Shifflett violated his own self-directed standards by working "hot," and that particular portions of the deposition testimony of Shifflett's own retained experts, Michael Dean and William Hammer, support the proposition that Shifflett was contributorily negligent. EPS raises essentially the same arguments in support of its motion for summary judgment on the issue of assumption of the risk. Additionally, EPS argues that Shifflett fully appreciated the risk of working on energized equipment and that, despite that risk, he voluntarily

---

[4] Pursuant to 29 C.F.R. § 1926.416(a)(1), "[n]o employer shall permit an employee to work in such proximity to any part of an electric power circuit that the employee could contact the electric power circuit in the course of work, unless the employee is protected against electric shock by deenergizing the circuit and grounding it or by guarding it effectively by insulation or other means."

[5] Pursuant to 29 C.F.R. § 1926.416(a)(3), "[b]efore work is begun the employer shall ascertain by inquiry or direct observation, or by instruments, whether any part of an energized electric power circuit, exposed or concealed, is so located that the performance of the work may bring any person, tool, or machine into physical or electrical contact with the electric power circuit."

assumed that the energized bus bars were divided from the lower portion of section five by a barrier.

In response to EPS's arguments, Shifflett contends that de-energizing the switchboard would have turned off the power to the entire job site, and that his supervisor would not have permitted him to turn off the power at that particular time.  Shifflett also emphasizes that William Hammer testified that it was not standard practice to shut down an entire switchboard, and that Shifflett's supervisor, Richard Yates, testified that he could not say whether he would have expected Shifflett to de-energize the switchboard prior to reaching into it.  Likewise, Michael Dean testified that he "probably would have done the same thing as far as pulling [the ground cable] out," and that he would have pulled it out without de-energizing the switchboard or wearing personal protective equipment.  (Dean Dep. at 51.)  Additionally, Shifflett emphasizes that both Hammer and Dean testified that there was a different standard in effect on the date of Shifflett's injuries regarding the level of personal protective equipment that an electrician should wear, and that Dean testified that most industrial electrical companies did not use personal protective equipment at that time.  Shifflett notes that this assessment is consistent with Yates' deposition testimony, in which he indicated that Design Electric only had insulated gloves available for employees to use on the date of the incident.  Relying on Dean's deposition testimony, Shifflett argues that insulated gloves would have provided no protection, since they are made of rubber and would have likely melted on him.

In response to EPS's assertion that Shifflett should have visually inspected section five to determine whether a barrier was shielding the lower portion of the section from the upper portion's energized bus bars, the plaintiff argues that he could not have seen the bus bars from

the front of the switchboard unless he had placed his head near the floor and looked back up inside the cabinet. When Hammer was asked whether he "would have done that before [he] stuck anything into that cabinet," Hammer testified as follows: "Well, I mean, not to what [Shifflett] was doing. If I go there and I see a wire down there in the bottom, and I go over there to check it out, I'd go there and check it out." (Hammer Dep. at 78-79.) Shifflett also emphasizes that he used his "wiggie" to test the neutral bar and the ground bar for the presence of a live current, prior to reaching for the loose cable, and that Dean testified that such actions were sufficient:

> Q   To verify there's no voltage for the job he did, what would he have had to check?
>
> A   The ground bar. The neutral bar. What he seen. What he could physically see.
>
> Q   Is it what he could physically see, or what he was in close enough proximity to come in contact with?
>
> A   From the pictures that I've seen, I would have told my guys at that – those bars is what they would have checked.
>
> Q   All right, let me – you want –
>
> A   I don't think I would have had them actually lay on their back and look up underneath.

(Dean Dep. at 151.) Shifflett argues that there was no need to test the loose cable itself, since it was marked with green tape, and that identifying cables by color code is an accepted practice among electricians. As for EPS's assertion that Shifflett violated his own self-directed standard that an electrician should "never work hot," Shifflett contends that he specifically denied any intention of doing any "hot work." (Shifflett Dep. at 103.)

With respect to assumption of the risk, Shifflett notes that he was under the impression that he was working in a neutral section of the switchboard that was insulated from energized components.  While Shifflett's impression proved to be wrong, Shifflett argues that there can be no finding of assumption of the risk, since he subjectively believed that it was safe to retrieve the loose cable from the cabinet.

Viewing the record in the light most favorable to Shifflett, the court concludes that reasonable minds could differ as to whether Shifflett acted with contributory negligence or assumed the risk of his injuries.  Even if Shifflett's actions were in violation of the applicable OSHA regulation, such evidence would, at most, create a rebuttable presumption of contributory negligence under Virginia law.[6]  See Jenkins v. North American Van Lines, Inc., 1995 U.S. App. LEXIS 1769, at *11-12 (4th Cir. Jan. 30, 1995) ("The district judge did not abuse his discretion in instructing the jury on the effect of Jenkins' non-compliance with the OSHA regulation.  He described a rebuttable presumption and stated the grounds on which it could be rebutted, leaving room for Jenkins to argue that he was not negligent if he acted reasonably under the circumstances."); Marslender v. Virginia Elec. and Power Co., 37 Va. Cir. 199, 200 (Va. Cir. 1995) (ruling that the defendant could introduce OSHA regulations as evidence of the duty of care that the plaintiff was required to exercise for his own safety, but that the defendant could not introduce the plaintiff's alleged OSHA violations as negligence per se).  Viewing the testimony of Dean and Hammer in the light most favorable to Shifflett, the court agrees with Shifflett that

---

[6] The court recognizes that some courts in other jurisdictions have held that evidence of OSHA violations may compel a finding of negligence per se.  See, e.g., Kull v. Six Flags Over Georgia II, L.P., 592 S.E.2d 143, 144 (Ga. Ct. App. 2003) (applying Georgia law).  However, "most have held that an OSHA violation is not negligence per se." Gulasky v. Ingram Barge Co., 2006 U.S. Dist. LEXIS 2854, at *5 (W.D. Ky. Jan. 24, 2006).

he has presented sufficient evidence, at this stage of the litigation, to rebut such presumption.
Likewise, while the switchboard's warning labels may be relevant to the issue of contributory
negligence, see Wood v. Bass Pro Shops, Inc., 462 S.E.2d 101, 104 (Va. 1995), the court is
unable to conclude, as a matter of law, that the plaintiff acted with contributory negligence by
failing to follow the labels' instructions. See, e.g., Hall v. Int'l Paper Co., 2007 U.S. Dist.
LEXIS 75065, at *8 (E.D. Va. Oct. 9, 2007) ("Ignoring a manufacturer's instructions about how
to use a product does not constitute unforeseeable misuse as a matter of law."). Finally, with
respect to assumption of the risk, the court is unable to conclude, as a matter of law, that Shifflett
fully understood the nature and extent of the danger and voluntarily exposed himself to it.
Accordingly, both the issue of contributory negligence and the issue of assumption of the risk
must be decided by the jury.

### Conclusion

For the reasons stated, EPS's motion for summary judgment will be denied, and the case
will proceed to trial. The Clerk is directed to send certified copies of this memorandum opinion
and the accompanying order to all counsel of record.

ENTER: This ___1st___ day of November, 2007.

_____
United States District Judge